# United States Court of Appeals
## For the First Circuit

Nos. 05-1653
     05-1726

CHARTER COMMUNICATIONS ENTERTAINMENT I, DST
D/B/A CHARTER COMMUNICATIONS,

Plaintiff, Appellant,

v.

THOMAS (A/K/A TOM) BURDULIS and
MIGUEL (A/K/A MIKE) SÁNCHEZ,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Stafford,* Senior District Judge.

Robert J. Munnelly, Jr., with whom Burton B. Cohen and Murtha
Cullina LLP, were on brief, for appellant.

August 25, 2006

* Of the Northern District of Florida, sitting by designation.

**TORRUELLA, Circuit Judge.** Plaintiff-appellant Charter Communications ("Charter"), a cable television operator, filed separate suits against defendants-appellees Thomas Burdulis ("Burdulis") and Miguel Sánchez ("Sánchez") for unauthorized reception of cable programming. After both Burdulis and Sánchez defaulted in their respective cases, the district court entered judgment in favor of Charter and awarded damages. In this consolidated appeal, Charter contends that the district court erred in determining the amount of damages to which it is entitled. After careful consideration, we affirm.

## I. Background

Charter is a cable operator that provides cable television programming to its customers. Charter's customers pay a monthly fee based on the level of service they desire. For example, customers can choose to receive only the channels included in Charter's basic service tier or expanded basic tier. However, they can elect to pay additional money each month and receive certain "premium" channels (e.g., HBO or Showtime) as part of their cable package. Customers can also pay, on a per-event basis, for individual pay-per-view movies or special event programming.

Charter itself receives most of its programming from radio signals sent by satellite, and it retransmits these signals to customers via cable or wire. Charter's cable signals for premium channels and pay-per-view services are electronically coded

-2-

or "scrambled," so they must be decoded by electronic decoding equipment for the signals to be viewed clearly on a television. To decode the signals, Charter provides subscribers of these services with electronic decoding devices known as converters. Charter programs each of its converters specifically to permit subscribers to view only the level of service purchased. There also exist, however, unauthorized converters, known as "descramblers" or "black boxes" -- devices that have been designed or modified to defeat the security functions of Charter's cable system.

The instant cases arose following court-ordered productions of business records from manufacturers of illegal cable descrambling devices in Time Warner Cable of New York City v. Visual Communications & Elec., Inc., No. 98-3936 (E.D. Pa. July 29, 1998), and AT&T Broadband v. Modern Elec., Inc., No. 8:02-CV-00430 (D. Neb. Sept. 17, 2002). The business records revealed that in August 2000, Burdulis had purchased one illegally modified cable descrambler device. They also revealed that in February and July 1997, Sánchez had purchased twelve "quickboards"[1] designed to effect the unauthorized reception of Charter's premium and pay-per-view programming. Sánchez also purchased a specialized type of

---

[1] A quickboard is a device that, when inserted into the converter, decodes or descrambles the scrambled cable programming. With a quickboard, an individual can view all or virtually all of the premium and pay-per-view services offered by a cable operator, despite not having paid for that content.

screwdriver that allowed him to insert the quickboards into the converters.

Using this information, Charter filed separate suits against Burdulis and Sánchez pursuant to 47 U.S.C. § 553 ("§ 553") (unauthorized interception or reception of "any communications service offered over a cable system") and 47 U.S.C. § 605 ("§ 605") (unauthorized interceptions of "any . . . communication by radio").[2] Burdulis, however, did not respond at all to Charter's complaint. Although Sánchez did respond to Charter's complaint and the parties had subsequently agreed to settle the case, Sánchez failed to sign the settlement agreement and disappeared. Charter therefore moved in each case for an entry of default and an award

---

[2]    Although Charter's decision to use § 553 (unauthorized interception or reception of "any communications service offered over a cable system") in these actions makes sense on its face, the cable operator's use of § 605 (unauthorized interceptions of "any . . . communication by radio") requires some explanation. Charter contended that § 605 applied in this instance because the cable programming stolen by Burdulis and Sánchez involved, in essence, theft of radio signals transmitted over the cable network. Charter's decision to use § 605 was a strategic one, because although the remedies under §§ 553 and 605 are similar, § 605 offers more effective remedies in many instances. For example, § 605 provides for enhanced damages of up to $100,000 (compared to up to $50,000 under § 553) for theft activities undertaken for commercial advantage or private financial gain (compare § 605(e)(3)(C)(ii) and § 553(c)(3)(B)) and authorizes additional fines of up to $500,000 per violation for any person who "manufactures, assembles, modifies, imports, exports, sells, or distributes" satellite cable theft devices (§ 605(e)(4)). Additionally, under § 605(e)(3)(B)(iii), an award of attorneys' fees is mandatory for any violations of § 605(a), in contrast to discretionary awards under § 553(c)(2)(C).

-4-

of statutory damages, plus attorneys' fees and costs, under §§ 553 and 605.

On January 11, 2005, the district court issued a Joint Memorandum and Order ("Joint Order") in cases involving Burdulis and two other Charter defendants, holding that § 605 did not apply to theft of radio signals transmitted over a cable network.[3] The district court also ruled that the amount of statutory damages awarded should be limited to the estimated value of the cable services stolen, without consideration of other theft-related harms to Charter or of the role of damages in deterring cable theft.[4] Following Charter's request for reconsideration, the court issued an Amended Memorandum and Order, discussing only the case of Burdulis, in which it reaffirmed its earlier conclusions ("the Burdulis Order").[5]

Shortly after the release of the Amended Memorandum and Order, the district court issued an additional Memorandum and Order pertaining to the Sánchez case ("the Sánchez Order"). In the Sánchez Order, the district court adopted the reasoning of the

---

[3] The Joint Order is reported sub nom. Charter Communications Entm't. I, LLC v. Cintrón, No. 04-40064, 2005 U.S. Dist. LEXIS 11678 (D. Mass. Jan. 11, 2005).

[4] The district court also granted attorneys' fees, costs, injunctive relief, and a small award of enhanced damages ($1,000) pursuant to § 553(c)(3)(B).

[5] Charter settled with the other two defendants prior to issuance of the Amended Memorandum and Order.

Burdulis Order and held that § 605 remedies did not apply to theft of radio signals over a cable network. The court also issued a separate ruling that, under § 553, not more than one award of statutory damages of up to $10,000 would be allowed for all twelve of Sánchez's established statutory violations.[6]

In this consolidated appeal, Charter contends that the district court, in handing down its rulings in both the <u>Burdulis</u> and <u>Sánchez</u> cases, erred in three ways in determining the amount of damages to which Charter is entitled. First, Charter contends that the district court was incorrect in holding that § 605 does not apply to theft of radio signals transmitted over a cable network. Second, the cable operator argues that the district court was wrong to hold that under § 553 only one award of statutory damages of up to $10,000 is allowed, even when multiple statutory violations are established. Finally, Charter contests the district court's ruling that statutory damages should be limited to the value of the cable services used, without consideration of other theft-related harms to Charter or of the value of damages in deterring cable theft.

---

[6] The district court also granted attorneys' fees, costs, injunctive relief, and $36,000 in enhanced damages pursuant to § 553(c)(3)(B).

## II. Discussion

### A. Standard of review

The three issues in this case are purely legal questions reviewed de novo. See United States v. Leja, 448 F.3d 86, 92 (1st Cir. 2006) (stating that "[t]he district court's resolution of legal questions . . . is reviewed de novo"); Gen. Motors Corp. v. Darling's, 444 F.3d 98, 107 (1st Cir. 2006) (noting that "[s]tatutory interpretation typically raises questions of law engendering de novo review").

### B. The applicability of remedies under § 605

The first issue in this appeal is whether the remedies provided for under § 605, which applies to the theft of radio communications, are available to Charter in these cases.[7] Section 605 provides a plaintiff with enhanced damages of up to $100,000, additional fines, and mandatory awards of attorneys' fees.[8] The district court, however, held that § 605 was inapplicable in this case and that Charter could only benefit from the remedies set forth in § 553. The district court noted that § 605 applied only in cases involving unauthorized _radio_ communications, and not in cases involving _wire_ or _cable_ communications. Since Burdulis and Sánchez were involved in theft of cable communications (i.e.,

---

[7] As the district court correctly noted, there is no question that Charter can take advantage of the remedies provided for under § 553, which applies to the theft of cable service.

[8] See supra note 2.

-7-

communications offered over a wire or cable system), § 605 remedies were unavailable.  Charter contends that the district court's ruling was erroneous and provides a number of arguments designed to demonstrate that the district court should have applied § 605 remedies in this case.  We address Charter's arguments in turn.

### 1.  Statutory text and the regulatory framework

Charter begins by focusing on the statutory text.  It asserts that nowhere in the relevant statutes does Congress expressly state, or by clear implication provide, that § 605 cannot apply to services delivered over a cable network.  As a result, Charter contends that it should be allowed to recover from Burdulis and Sánchez under § 605.

We, however, believe that the statutory text does make clear that § 605 is not to apply to signals delivered by wire over a cable network.  And if there is any doubt, we think that the structure of the regulatory regime provides the necessary clarity.

Regarding the statutory text itself, the district court correctly points out that § 605 is noteworthy for its general exclusion of communications by wire or cable.  As we discuss below, § 605 does make reference to communications by wire or cable in a few, very limited instances.  Most of these instances, however, have no relevance to the instant case.  The vast majority of § 605 is devoted to communications by radio.  Moreover, Congress clearly understood the difference between "communication by radio" and

"communication by wire," as it defined separately the two methods of communication.  See, e.g., 47 U.S.C. § 153(33) (defining "communication by radio"); id. § 153(52) (defining "communication by wire").  We presume that had Congress meant for "communication by wire" to be a pivotal part of the § 605 regulatory regime, it would have stated as much.  "[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 452 (2002) (internal quotation marks and citations omitted).  The fact that § 605 deals almost exclusively with "communication by radio" speaks volumes, and we think there was no need for Congress to make specific reference to its general desire to exclude "communication[s] by wire" from the § 605 regulatory framework.

The structure of the regulatory regime in this area also provides convincing evidence that Congress did not intend for § 605 to regulate communications by wire. As the district court relates, Congress devised the regulatory regime in such a way that regulation was to depend on the method of transmission -- by radio or by wire.  Section 605 deals with communications traveling through the air (via radio), whereas § 553 covers communications traveling over cable wire.  The legislative history to § 553

demonstrates conclusively that Congress distinguished between "communication[s] by radio" and "communication[s] by wire" in establishing this bifurcated regulatory framework:

> The Committee intends the phrase "service offered over a cable system" [in § 553] to limit the applicability of [§ 553] to theft of a service from the point at which it is actually being distributed over a cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.

H.R. Rep. No. 98-934, at 83 (1984), as reprinted in 1984 U.S.C.C.A.N. 4655, 4720.

In this case, the fact that the transmissions were intercepted as they were transmitted via cable, not radio, is dispositive. As the district court relates in the Sánchez Order, "[t]he change in form of transmission of the communication, from an airborne signal to a signal traveling over a cable wire, changes the applicability of the statute; when the communication is stolen as it is being transmitted over a cable wire, § 553, not § 605, applies." Given this clear demarcation between the two forms of regulation, there was no need for Congress to state specifically in the statutory text that § 605 does not apply to services delivered over cable.

-10-

In three different ways, however, Charter contests such a characterization of the statutory text and the regulatory framework -- i.e., the notion that § 605 was designed to deal only with radio transmissions and § 553 only with cable transmissions. First, it notes that § 605 contains language referring to wire transmissions -- namely, the standing rules in § 605 defining who is entitled to sue for a violation of the statute. Section 605(d)(6) states that "the term 'any person aggrieved' [referenced in § 605(e)(3)(A)] shall include any person with proprietary rights in the intercepted communication by <u>wire</u> or radio. . . ." 47 U.S.C. § 605(d)(6) (emphasis added). Charter asserts that this reference to "communication by wire" in § 605(d)(6) demonstrates that Congress did indeed intend for § 605 to regulate at least some "communication by wire."

We reject this argument. Although we can find no definitive guidance regarding Congress's intent in including the reference to "communication by wire" in § 605(d)(6), we note that the report accompanying the 1988 amendment that added § 605(d)(6) indicated that the purpose of the section was, in part, "expanding standing to sue." H.R. Rep. No. 100-887(II), at 28 (1988), <u>as reprinted in</u> 1988 U.S.C.C.A.N. 5577, 5657. The relevant portion of the legislative history reads as follows:

> Section 5 of the [Satellite Home Viewer Act of 1988] amends [§ 605] of the Communications Act pertaining to the piracy of satellite cable programming. The Committee's amendment is

> intended to deter piracy practices by (1) stiffening applicable civil and criminal penalties, (2) <u>expanding standing to sue</u>, and (3) making the manufacture, sale, modification . . . of devices or equipment with knowledge that its primary purpose is to assist in unauthorized decryption of satellite cable programming expressly actionable as a criminal act.

<u>Id.</u> (emphasis added).

The resulting legislation "expand[ed] standing to sue" because it affirmed the right of cable operators who transmitted communications to consumers via wire or cable to sue for unauthorized interceptions of radio or satellite communications. What drove the legislation was the understanding that a transmission emanating from a satellite potentially made several intermediate stops before reaching the ultimate consumer. We see Congressional recognition of this fact, for example, in § 605(d)(1), where Congress defined "satellite cable programming" as "video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers."[9]  <u>See also</u> <u>id.</u> at 11, 1988 U.S.C.C.A.N. at 5639-40 ("Cable systems pay satellite carriers a per subscriber fee for delivering to the system a broadcast

---

[9]  This is to be distinguished from direct-to-home satellite services, which sends programming directly to consumers rather than to cable operators who retransmit it to their subscribers.  <u>See</u> <u>DirecTV, Inc.</u> v. <u>Tasche</u>, 316 F. Supp. 2d 783, 786 (E.D. Wis. 2004).

signal; the systems then send out the signal over the wire to their subscribers.").

Under such a conception of the telecommunications process, the cable operator stands to lose just as the satellite owner does if the satellite transmission is stolen. The cable operator, after all, loses out on a potential customer if the transmission is intercepted. Had the cable "pirate" not stolen the transmission, he or she may very well have doled out the money to purchase cable from the cable operator.

What Charter fails to grasp is that if the cable operator does decide to sue by taking advantage of the standing rules articulated in § 605(d)(6), the substantive law that is applied is § 605, not § 553. In other words, § 605(d)(6) does "expand[] standing to sue" and allows cable operators to sue regarding a theft of communications that occurred before the communications ever reached them. However, this does not mean that Congress is regulating, via § 605, communications by wire. What is being regulated is the theft of radio or satellite signals. As such, Charter's argument that § 605 regulates the theft of cable signals is incorrect.

In its second attempt to break down the wall Congress created between radio and cable communications, Charter notes how federal courts in the early 1980s, when confronting the sale and use of illegal cable descramblers, held "apparently unanimously"

-13-

that § 605 applied to radio signals transmitted over a cable network. Charter may be correct that federal courts in the early 1980s did apply § 605 to radio signals transmitted over a cable network. This, however, was a function of the fact that at the time, there existed a gap in the regulation of theft of cable services. As the district court correctly points out, the adoption of the Omnibus Crime Control and Safe Streets Act of 1968 ("Crime Control Act"), Pub. L. No. 90-351, 82 Stat. 197, removed most references to wire (cable) transmissions in § 605, leaving § 605 to apply only to radio transmissions. Moreover, § 553 had not yet been enacted. Thus, courts in the early 1980s, in the absence of any explicit and tailored regulatory framework, were in essence compelled to use § 605 as a means of preventing the theft of cable services. With, however, the adoption of § 553 in 1984 in the Cable Communications Policy Act, Congress provided a new regulatory framework that courts could use to combat the theft of cable services, and courts were no longer bound to rely on § 605 to deal with the problem. Thus, Charter's reliance on certain federal court decisions from the early 1980s -- all of which, incidentally, predate the passage of § 553 -- is misplaced.[10]

---

[10] The effective date of § 553 was October 30, 1984. The cases cited by Charter are: Ciminelli v. Cablevision, 583 F. Supp. 158 (E.D.N.Y. March 28, 1984); Cablevision Sys. Dev. Co. v. Annasonic Elec. Supply, No. CV-83-5159, 1984 U.S. Dist. LEXIS 19592 (E.D.N.Y. Feb. 10, 1984); Cox Cable Cleveland Area, Inc. v. King, 582 F. Supp. 376 (N.D. Ohio October 18, 1983); and Porter County Cable Co., Inc. v. Moyer, 624 F. Supp. 1 (N.D. Ind. Jan. 13, 1983).

In Charter's final attempt to show that § 605 does apply to certain aspects of "communication[s] by wire," it contests the district court's conclusion that the anti-theft protections in § 553 for wire communications would be largely unnecessary if § 605 applied to radio signals over a cable network. Charter states that even with § 605 applying to radio signals over a cable network, the anti-theft protections in § 553 would play a specific and important role. According to Charter, § 605, with its standing rules, only allows cable operators to sue for interceptions of "satellite cable programming," including radio-based signals over a cable television network.[11] Section 605, however, provides no protection against theft of non-video services that can travel over cable -- for example, services such as private line data transmission and at-home shopping and banking. To Charter, Congress enacted § 553 specifically to deal with the theft of these non-video services.

We disagree with this characterization of the regulatory framework. We believe that § 553 was intended to play a much more significant role in the regulatory scheme than in the mere

---

[11] We note that the opening assumption of Charter's argument -- namely, that cable operators can sue only for interceptions of "satellite cable programming" -- is not necessarily correct. Although "satellite cable programming" is the only explicit subject area mentioned in § 605(d)(6), numerous courts have held that § 605 (d)(6) is to be read expansively and that the provision does not provide an exhaustive list of those who have standing. See, e.g., DIRECTV Inc. v. Budden, 420 F.3d 521, 527 (5th Cir. 2005); Nat'l Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 911 (6th Cir. 2001). However, we assume, arguendo, that Charter's assumption is correct.

protection of non-video services. Although non-video services such as private line data transmission and at-home shopping and banking are commonplace today, in 1984, when Congress passed the Cable Communications Policy Act and enacted § 553 and reenacted § 605, such non-video services were restricted to a tiny subset of the population. See H.R. Rep. No. 98-934, at 28 (1984), as reprinted in 1984 U.S.C.C.A.N. at 4665 (noting, for example, that "private line data services are in their infancy" and that "private line data services are only a small fraction of the current data transmission market"). What was more in the forefront of Congress's collective mind was the threat posed by the theft of traditional video cable services. See id. at 83, 1984 U.S.C.C.A.N. at 4720 (stating that the House Energy and Commerce Committee was "extremely concerned" about the theft of cable services and noting that "the theft of cable services poses a major threat to the economic viability of cable operators and cable programmers"). It makes no sense that Congress would go out of its way to come up with an entirely new regulatory regime (in the form of § 553) to combat what at the time was only a limited threat. In fact, the legislative history indicates clearly that this was not Congress's intention. See id. at 60, 1984 U.S.C.C.A.N. at 4697 (noting that at the time of the enactment of the Cable Communications Policy Act in 1984, several proceedings were then underway to determine the regulatory treatment of non-cable services provided over cable

-16-

systems, such as data transmission and private-line voice services).  Rather, we believe that Congress, in enacting § 553, was attempting to create a comprehensive regulatory regime covering the theft of all communications transmitted over a wire or cable -- something that had largely been unregulated since the enactment of the Crime Control Act in 1968 and the removal of most references to "communications by wire" from § 605.  In TKR Cable Co. v. Cable City Corp., 267 F.3d 196 (3d Cir. 2001), and United States v. Norris, 88 F.3d 462 (7th Cir. 1996), the Third and Seventh Circuits, respectively, supported such an interpretation.  As the district court correctly noted, "the evidence is overwhelming that Congress intended § 553 to address the serious, widespread problem of cable piracy, not a microscopically small range of conduct."

Since § 553 was enacted to combat the theft of all "communication[s] by wire," and not merely non-video services that can travel over cable, we think that the provisions of § 553 were intended by Congress to be the primary protections for cable communications.  We agree with the district court that such protections would be superfluous if § 605 also provided protection to certain "communication[s] by wire."

## 2. Statutory interpretation

Charter next attempts to utilize two established principles of statutory interpretation to support its view that § 605 encompasses radio-based signals over a cable network.  First,

-17-

Charter notes that because Congress in 1984 reenacted the existing version of § 605, the presumption is that Congress also intended to adopt the reasoning of the existing case law interpreting the statute -- including the pre-1984 precedents, discussed above, that interpreted § 605 as applying to theft of cable. See Lorillard v. Pons, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change") (internal citations omitted).

Under normal circumstances, we would indeed presume that Congress adopted all of the existing case law associated with § 605 when it reenacted that section without change.  In this instance, however, we believe that the Congressional adoption of § 605's associated case law is limited.  Because Congress reenacted § 605 at the same time it enacted § 553, we think that Congress adopted only the case law applicable to communication by radio.  As suggested above, if Congress were to adopt all of the case law traditionally associated with § 605 -- including the pre-1984 precedents applying § 605 to incidents of cable theft -- there would have been no need at all for it to enact § 553.

Second, Charter notes that because both § 553 and § 605 are remedial statutes, each statute's provisions are to be construed expansively to assist the party seeking restitution -- in this instance, Charter.  See Tcherepnin v. Knight, 389 U.S. 332,

-18-

336 (1967) (recognizing the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes"). Charter is correct to recognize the existence of such a canon. However, for us to read these statutes as Charter desires would require that we not only read the statutes broadly, but indeed beyond what Congress intended. We decline to do so.

### 3. Legislative history

Charter also argues that the legislative history to both § 553 and § 605 indicates that Congress intended for § 605 to be applicable to the theft of cable services.

We have already cited to certain aspects of the applicable legislative history to support our view of the relevant law in this case. Charter, however, cites to additional legislative history to support its arguments. We think that this additional legislative history does little to support Charter's position. For example, Charter cites to several paragraphs in a report issued by the House of Representatives regarding what eventually became § 553. H.R. Rep. No. 98-934, at 83 (1984), as reprinted in 1984 U.S.C.C.A.N. at 4720. Charter points in particular to a sentence stating that "[n]othing in [§ 553] is intended to affect the applicability of existing Section 605 to the theft of cable service." Id. This statement, however, must be read in light of Congress's own perceptions of the regulatory

scheme.  It is clear that Congress viewed § 605 as a means of combating the theft of cable service where the cable service took the form of radio/satellite communications, not "communication[s] by wire."  See 1984 U.S.C.C.A.N. at 4746 ("[S]ection 605 [has] provided broad protection against the unauthorized interception of various forms of radio communications.  It is the Committee's intention that the amendment preserve these broad protections.") (emphasis added).  That Congress would declare that § 605 remained applicable to the theft of radio communications, while intending for § 553 to provide a new protection against the theft of communications provided over wire or cable, is not at all surprising.  Thus, Charter's attempts to use legislative history to support its arguments fail.

### 4. Policy argument

Charter's final argument is based on policy.  It argues that Congress has repeatedly identified theft of cable services as a national problem and that it defies belief that Congress would have singled out cable (i.e., wire-based) operators for substantially worse treatment compared to their wireless video competitors.

We, however, think that Charter fails to appreciate the Congressional prerogative in setting up the regulatory framework and in setting the applicable penalty amounts. As discussed above, Congress, at the time of enacting § 553 in 1984, noted the major

-20-

threat posed by the theft of cable services. The anti-theft provisions enacted as part of § 553 were intended to combat this threat. Just four years later, however, Congress realized that problems persisted, particularly with regard to the piracy of wireless video. See, e.g., H.R. Rep. No. 100-887(II), at 14 (1988), as reprinted in 1988 U.S.C.C.A.N. 5577, 5642 (noting that "piracy has become an increasingly distressing problem to the satellite industry and seriously threatens to undermine the industry's survival"). As a result, it made a legislative judgment to increase the penalties applicable to theft of wireless services under § 605. See Pub. L. 100-667, § 205(10) (1988).

Thus, it is not that Congress is singling out cable (wire-based) operators "for substantially worse treatment" vis-à-vis wireless video competitors. It is merely that Congress has made a decision to stiffen the applicable penalties for piracy of wireless services. We decline to disturb this legislative judgment. If Congress finds that theft of wire-based cable continues to be a major problem, it certainly possesses the power to raise the penalty amounts for wire-based cable theft, so that such penalties are on a par with the amounts for wireless theft. Until that time, however, Charter will have to remain content with the penalty amounts available under § 553.

## C.  Limits on § 553 recovery

Having determined that Charter can pursue remedies only under § 553, we now turn to the second issue in this case -- whether there are any limits to Charter's recovery under § 553. The district court held that § 553 allows only one statutory damages award of not more than $10,000 even when there are multiple violations of § 553(a) (which prohibits the unauthorized reception of communications services offered over a cable system).  Charter contests this holding, arguing that it should be permitted to recover up to $10,000 for <u>each</u> violation committed.

We, however, believe that the district court was correct. The district court described the relevant statutory framework, and its application to this case, as follows:

> Section 553 creates both civil and criminal penalties for the unauthorized reception of cable service.  The statute is organized into three sections: § 553(a) defines the violation and relevant terms, § 553(b) provides criminal penalties, and § 553(c) provides civil penalties.  Section 553(a) allows the plaintiff to seek either actual or statutory damages.  Here, Charter elected to pursue statutory damages under § 553(c)(3)(A)(ii).

The court went on to note that § 553(c)(3)(A)(ii) provides that a plaintiff "may recover an award of statutory damages <u>for all violations</u> involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just" (emphasis added). By contrast, the text of § 553(b)(3), the criminal remedies section, states that "[f]or purposes of all penalties and remedies

-22-

established for violations of subsection(a)(1) of this section, the prohibited activity established herein as it applies to each such device shall be deemed a separate violation."  This language in § 553(b)(3) was added by Congress through a 1992 amendment.

We think that the plain text of § 553 demonstrates conclusively that Charter, in these civil actions, can recover only one statutory damages award of not more than $10,000, irrespective of the number of violations committed by Burdulis or Sánchez.  The statutory text of § 553(c)(3)(A)(ii) clearly states that a plaintiff "may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just" (emphasis added).  Thus, as was noted by the Third Circuit in Gen. Instrument Corp. of Del. v. Nu-Tek Elec. & Mfg., Inc., 197 F.3d 83 (3d Cir. 1999), § 553(c)(3)(A)(ii) "anticipates multiple violations and a single award of damages," the latter of which is limited to $10,000.  Id. at 95.  Thus, it is clear from a simple reading of the statutory text that a plaintiff can only recover a maximum of $10,000 in statutory damages under § 553(c)(3)(A)(ii), regardless of the number of violations.

That this is the case is all the more certain after comparing § 553(c)(3)(A)(ii) with the criminal remedies section in § 553(b).  As mentioned above, Congress amended § 553(b) in 1992. The Ninth Circuit noted in Cont'l Cablevision, Inc. v. Poll, 124

-23-

F.3d 1044 (9th Cir. 1997), that one cannot "overlook the fact that Congress changed the statute on the <u>criminal</u> side . . . yet left unchanged the word 'all' on the <u>civil</u> side of the statutory remedies." <u>Id.</u> at 1049. We again cite the important canon of statutory construction that "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>Barnhart</u>, 534 U.S. at 452 (internal quotation marks and citations omitted). Because Congress acted to alter the criminal section of the statute, yet decided to leave the civil section unchanged, we believe that Congress was clear in its desire to have violations of § 553(a) be considered collectively, rather than individually, when such violations form the basis of a civil action.

In prior cases, we have held that "[i]f the plain language of the statute points unerringly in a single direction, an inquiring court ordinarily should look no further." <u>Herman</u> v. <u>Héctor I. Nieves Transp., Inc.</u>, 244 F.3d 32, 35 (1st Cir. 2001). Charter, however, argues that the plain meaning of the statutory text is deceptive and that there are other indications that Congress wanted to allow plaintiffs to recover up to $10,000 for <u>each</u> violation of § 553(a).

Charter makes three arguments to support its position. First, it points to the language included by Congress in its 1992 amendment of § 553(b). Section 553(b) states, in relevant part, that "[f]or purposes of all penalties and remedies established for violations of subsection (a)(1) of this section, the prohibited activity established herein as it applies to each such device shall be deemed a separate violation." Charter focuses on the phrase "[f]or purposes of all . . . remedies" and claims that the inclusion of this phrase is proof that Congress intended for the per-violation rule to apply to civil remedies, as well as criminal ones. What Charter fails to grasp, however, is the Congressional placement of the quoted phrase. "For purposes of all . . . remedies" is included only in the criminal section of § 553, § 553 (b). We think it is significant that Congress chose to include the phrase here, rather than at the beginning of § 553 -- a placement that would have made it applicable to <u>both</u> the criminal and civil provisions of § 553. By placing the relevant phrase only within the limited confines of § 553(b), Congress, it seems to us, intended for the per-violation rule to apply only to criminal penalties.

Charter's second argument is policy-based. It argues that Congress, for pragmatic reasons, could only have intended to enable a plaintiff to recover up to $10,000 for each violation of § 553(a). If a plaintiff could only recover a maximum of $10,000

no matter how many violations occurred, contends Charter, it would lead to the "absurd" situation in which the plaintiff would simply bring separate § 553(c) civil actions with respect to each individual violation and secure multiple awards, at an unnecessarily increased cost in party and judicial resources.

It is true that the statutory scheme does, in many cases, permit a cable operator to bring separate § 553(c) civil actions with respect to each individual violation and secure multiple awards, at an increased cost in party and judicial resources.[12] However, we decline to label this result "absurd," since, instead of limiting the options available to the plaintiff, it actually increases them. The statutory scheme operates in such a way that, in cases where a plaintiff cannot show actual damages, the

---

[12]   We note that res judicata would not necessarily bar such multiple claims. We have held that res judicata applies when the following exist: "(1) a final judgment on the merits in an earlier proceeding, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two actions." Breneman v. United States ex rel. FAA, 381 F.3d 33, 38 (1st Cir. 2004) (internal quotation marks and citation omitted). The difficulty typically relates to the second prong of this test -- namely, whether there is "sufficient identicality between the causes of action asserted in the earlier and later suits." However, in González-Piña v. Rodríguez, 407 F.3d 425 (1st Cir. 2005), we noted that "[s]ubsequent conduct, . . . even if it is of the same nature as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action." Id. at 430 (quoting Kilgoar v. Colbert County Bd. of Educ., 578 F.2d 1033, 1035 (5th Cir. 1978)). Therefore, if Burdulis or Sánchez had been previously sued by Charter for one particular violation of § 553(a), Charter would still be able to sue the defendants for subsequently committed violations if the later violations took the same form as the earlier violation.

plaintiff is given the choice of whether to expend the resources to sue for each individual violation or whether to simply combine all of the violations together in a single suit. The former requires additional litigation, yet potentially provides the plaintiff with a greater recovery. The latter option limits the amount of litigation required but also limits the potential recovery. What course a particular plaintiff decides to pursue depends on the nature of the particular violation(s) committed, as well as the resources available to the plaintiff. We think that this expansion of options available to the plaintiff -- even given the possibility that it results in increased litigation -- is in accord with Congress's desire to provide cable companies and other potential plaintiffs with the tools they need to combat cable piracy.

We also wish to point out here a related policy reason militating strongly in favor of capping statutory damages at $10,000 for all violations combined. As the Ninth Circuit correctly noted in Poll, "if an award of $10,000 for each violation is allowed, then few if any plaintiffs would ever avail themselves of actual damages, because recovery of statutory damages, which requires no proof of loss, will likely be as high or higher than actual damages." Poll, 124 F.3d at 1049. Actual and statutory damages, however, can serve very different purposes, and to think that Congress meant to completely obliterate the regime developed to support actual damages is unthinkable.

Charter's final argument is that the district court ignored the fact that in several of the cases the court cited from other jurisdictions, notably the Ninth Circuit decision in <u>Poll</u>, the courts supported their conclusions as to the capped statutory damages for "all violations" under § 553 by relying on the assumption that cable operators retained access to the more potent § 605 statutory remedies. However, in this case, notes Charter, cable operators do not have access to the more potent § 605 statutory remedies (as a result of the district court's decision). Thus, there is no easily discernible reason for capped statutory damages under § 553.

Charter, however, misreads the precedents it cites in support of its position. Although the Ninth Circuit in <u>Poll</u> does refer to Congress's desire to bring certain sanctions for violations of § 553 "into conformity with" certain sanctions for violations of § 605, the court in that case does not state that the rationale for capped damages under § 553 is the ready availability of § 605 remedies. In other words, the fact that civil remedies under § 553 are capped is independent of the availability of § 605 remedies. Accordingly, we reject Charter's argument.

**D.  Permissible factors to consider under § 553(c)(3)(A)(ii)**

Having determined that Charter, under § 553(c)(3)(A)(ii), may only receive, at most, one award totaling $10,000 for all violations, we now turn to the final issue in this case -- namely,

what factors the district court may consider in deciding what amount to award under § 553(c)(3)(A)(ii). In this case, the district court calculated statutory damages based solely on the estimated value of the services stolen, without consideration of other harms to Charter or of other policies favoring deterrence. Charter contests such a method of calculating damages, arguing vehemently that statutory damages should include amounts for, among other things, injury to its goodwill, injury to its future growth and profitability, and injury to the quality of cable services received by Charter's paying subscribers. Charter also contends that any statutory damages award should include an amount that would "further the policies of deterrence" with respect to cable piracy.

In arriving at its decision to base damages solely on the estimated value of the services stolen, the district court, in the absence of any guidance from us on the matter, relied heavily on the reasoning of a prior district court case, Comcast of Mass. I, Inc. v. Naranjo, 303 F. Supp. 2d 43 (D. Mass. 2004). In that case, the cable operator had argued, as Charter does here, that the court should consider a number of factors in calculating damages, including actual damages, the willfulness of a defendant's violation, the importance of deterrence, and defendant's cooperation with the plaintiff. The court, however, rejected such a proposal, holding that statutory damages should be "as reasonable

an estimate of actual damages as the facts . . . allow," not greater. Id. at 48.

The court in Naranjo noted that according to the plain language of the statute, statutory damages are merely an alternative to actual damages. The statute creates no difference between the two. Thus, although it is possible to conclude that the statutory damages provision is intended to allow a court to impose greater damages than available under the actual damages provision, "the plain language offers no identified reason to reach that conclusion." Id. The court also noted that the award for deterrence that the plaintiff sought to build into the statutory damages award was actually served by other subsections of § 553, which provided enhanced damages for willfulness and an injunction to prevent future violations. Id. at 48-49 (referring to 47 U.S.C. §§ 553(c)(2)(A), 553(c)(3)(B)). Finally, the court stated that the position articulated by the plaintiff in that case would lead to "absurd results." The court wrote:

> Under plaintiff's theory, an aggrieved party may receive as statutory damages premiums to deter future conduct in addition to actual or estimated actual damages. Statutory damages, however, may not exceed $10,000. As a result, parties that have suffered large actual damages (greater than $10,000) cannot receive any deterrence premiums. But if any violators require an additional deterrence premium, it is those who have caused the largest amounts of harm.

_Id._ at 49. Accordingly, the court in _Naranjo_ held that statutory damages should be calculated based solely on an estimate of actual damages.

The district court in the instant case agreed with the approach taken in _Naranjo_ and applied its rule, noting that that approach "best satisfies the command of the statute and the judicial interest in promoting predictability and transparency." We agree. We find the reasoning of _Naranjo_ to be persuasive and believe it represents the correct view of the law. Charter, however, makes several arguments designed to show that the _Naranjo_ approach is incorrect and that statutory damages should include more than merely the estimated amount of actual damages.

First, Charter contends that "nothing in the statutory text or legislative history indicates a court should limit statutory damages only to the cost of video services stolen." This may be true, but the statutory text and legislative history also do not state that a court should look at all harms to the cable operator, as Charter desires. In actual fact, the only guidance we receive from Congress on this matter is that the issue of damages is at the discretion of the judge. _See_ 47 U.S.C. § 553(c)(3)(A)(ii) (noting that "the party aggrieved may recover an award of statutory damages . . . _as the court considers just_") (emphasis added). Given that there are convincing reasons, as discussed in _Naranjo_, for limiting the damage award to a reasonable estimate of

-31-

actual damages, we believe that the district court was correct in the exercise of its discretion and refusing to follow the approach advocated by Charter.

Second, Charter argues that the remedies provisions in § 553 contain a "statutory goal of restitution" to the cable operator. It contends that the non-service-related damages it cited -- e.g., injury to its goodwill, injury to its future growth and profitability -- should have been taken into account in any determination of damages, so as to ensure that it received restitution for its "damages" from the "violations." Charter does not tell us exactly what "remedies provisions" in § 553 it is referring to, so we are unable to assess whether these provisions do contain an explicit "statutory goal of restitution."

Similarly, Charter does not explain with specificity what it means by "restitution" in this context. At times, "restitution" is understood as a <u>substitute</u> for damages. <u>See</u> <u>Gilpin</u> v. <u>Am. Fed. of State, County, and Mun. Employees</u>, 875 F.2d 1310, 1314 (7th Cir. 1989) (noting that "restitution . . is ordinarily (although not invariably) a substitute for rather than a form of damages"). In such instances, it is, needless to say, essential to distinguish between "restitution" and "damages." As one authority describes the difference, "[t]he damages recovery is to compensate the plaintiff, and it pays him, theoretically, for his losses. The restitution claim, on the other hand, is not aimed at compensating

the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep."  Dan B. Dobbs, Handbook on the Law of Remedies 224 (1973) (cited in Gilpin, 875 F.2d at 1314).

Applying such definitions to the instant case, we simply do not see how the remedy sought here by Charter can be considered "restitution."  If a court was to provide Charter with compensation for, say, injury to Charter's growth and profitability, the court would be addressing the plaintiff's losses -- traditionally the realm of "damages" -- rather than an ill-gotten gain of the defendants (for the defendants in this case did not wrongly appropriate Charter's future growth and profitability for their own gain).

Charter, however, may instead be using "restitution" in a more colloquial sense, such that it desires to recover from the defendants for all the damage they caused as a result of their piracy.  Such a usage of the term "restitution" would mean both that the defendants would disgorge any ill-gotten gains, and that the plaintiff would be able to recover for any other losses it incurred as a result of the defendants' misconduct.  With this definition, Charter would indeed be able to recover fully for injury to its goodwill, injury to its future growth and profitability, and injury to the public, not to mention actual damages.

-33-

We, however, are unclear which definition of "restitution" Charter is utilizing in its brief. Without any additional guidance from Charter on this matter, we find ourselves unable to evaluate the merits of its claim. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. As we recently said in a closely analogous context: 'Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or forever hold its peace.'") (citations and some internal quotation marks omitted).

Charter's final argument is that the district court's exclusive focus on the estimated value of the services stolen in awarding statutory damages fails to account for the need to deter cable pirates. Deterrence, Charter claims, "is an implicit consideration in deciding the discretionary amount of statutory damages under § 553(c)(3)(A)(ii)." We disagree. Although Charter cites to a passage in the legislative history demonstrating that deterrence was indeed on the minds of Congressional drafters as they prepared what became the Cable Communications Policy Act, the passage cited has nothing to do with the determination of statutory damages. In other words, although Congress did express a desire to

deter cable pirates, nowhere did it key this desire for deterrence to the determination of statutory damages.

This makes sense, for, as the district court in <u>Naranjo</u> pointed out, Congress addressed the need for deterrence in other statutory provisions. Section 553(c)(2)(A), for example, allows a court to impose an injunction on defendants, thus preventing future violations. Congress similarly focused on deterrence in enacting § 553(c)(3)(B), which authorizes enhanced damages for certain willful conduct. With the existence of these separate provisions addressing deterrence, there was no need for Congress to ask courts to address the issue when determining statutory damages. Moreover, asking courts to consider deterrent effect as a factor in calculating statutory damages would have led to "absurd results," as the <u>Naranjo</u> court demonstrated. <u>See</u> <u>Naranjo</u>, 303 F. Supp. 2d at 49. Accordingly, we find incorrect Charter's contention that deterrence is an "implicit consideration" in deciding the amount of statutory damages under § 553(c)(3)(A)(ii).

### III. Conclusion

For the foregoing reasons, the decision of the district court is affirmed.

**<u>Affirmed</u>**.