REVISED MAY 2, 2014

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 2, 2014

Lyle W. Cayce
Clerk

No. 13-10485

J&J SPORTS PRODUCTIONS, INCORPORATED, as Broadcast Licensee of the December 8, 2007 "Undefeated":  Mayweather/Hatton Event,

Plaintiff - Appellee

v.

MANDELL FAMILY VENTURES, L.L.C., Individually and doing business as Greenville Avenue Pizza Company; SAMUEL J. MANDELL, III, Individually and doing business as Greenville Avenue Pizza Company,

Defendants - Appellants

Appeal from the United States District Court
for the Northern District of Texas

Before WIENER, HAYNES, and HIGGINSON, Circuit Judges.

HAYNES, Circuit Judge:

Defendants Mandell Family Ventures, L.L.C. and Samuel J. Mandell, III (collectively, the "Defendants") appeal the district court's grant of summary judgment in favor of Plaintiff J&J Sports Productions, Inc. ("J&J") on J&J's Federal Communication Act ("FCA") claims pursuant to 47 U.S.C. §§ 553 & 605.  We REVERSE and REMAND.

### I.  Background

This case concerns the live broadcast of the Floyd "Money" Mayweather, Jr. v. Ricky Hatton WBC Welterweight Championship Fight (the "fight") on

No. 13-10485

December 8, 2007. The rights to broadcast the fight were held by various entities, including Time Warner Cable ("TWC") and J&J. TWC was granted the rights to broadcast the fight by means of pay-per-view to only those venues "not accessible to the public in general." The agreement granting TWC these rights contemplated that TWC might inadvertently broadcast the event to "commercial subscribers" and provided for a liquidated-damages fee to be paid by TWC under such circumstances. Conversely, J&J was granted the rights to broadcast the fight to only "commercial closed-circuit television exhibition outlets."

Greenville Avenue Pizza Company ("GAPC") is a restaurant in Dallas, Texas, which is owned by the Defendants. At all times relevant to this case, GAPC received commercial cable television services from TWC pursuant to a "Commercial Services Agreement." On December 8, 2007, GAPC purchased the pay-per-view broadcast of the fight from TWC for $54.95 and displayed the fight in its restaurant during business hours. GAPC did not advertise the fight or charge an entry fee or any other fee to view the fight. Representatives of both GAPC and TWC attest that TWC authorized GAPC's receipt of the broadcast. A representative of TWC described the authorization as an inadvertent error on its part.[1]

On December 7, 2010, J&J initiated this action against the Defendants, alleging that they violated §§ 553 and 605 by receiving and displaying the fight without first paying a licensing fee to J&J. At the conclusion of discovery, J&J filed a motion for summary judgment, which the district court granted, awarding J&J statutory damages of $350 and costs and attorney's fees of $26,780.30. Defendants timely appealed.

---

[1] For this error, TWC offered to pay J&J $2,000 in liquidated damages pursuant to TWC's pay-per-view broadcast agreement.

2

No. 13-10485

## II.  Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  We review a district court's grant of summary judgment *de novo*, construing all facts and evidence in the light most favorable to the non-moving party.  *See EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009).

## III.  Discussion

J&J alleged below that the Defendants violated both §§ 553 and 605. While granting judgment in J&J's favor, the district court refrained from deciding which of the two sections applied to the Defendants' conduct, implicitly finding that J&J was entitled to judgment as a matter of law under at least one of the two sections.  As explained more fully below, because we find a dispute of material fact exists as to J&J's § 553 claim, we must determine whether § 605 applies to the facts of this case.  We hold that it does not.

*A.  Whether § 553's Safe Harbor Applies*

Section 553(a)(1) imposes civil and criminal liability for "intercepting or receiving any communications service offered over a cable system."  47 U.S.C. § 553(a)(1) (2006).  But it includes an essential exclusion, often referred to as a "safe harbor," that precludes the imposition of liability on the majority of cable recipients—customers of cable providers.  This exclusion constrains the reach of the statute by exempting from liability those individuals who receive authorization from a cable operator:

> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, *unless specifically authorized to do so by a cable operator* or as may otherwise be specifically authorized by law.

*Id.* (emphasis added).

3

No. 13-10485

The Defendants maintain that they fall within this safe harbor. To support their argument, they provided evidence that GAPC (1) was a paying commercial customer of TWC; (2) paid a separate fee for the pay-per-view broadcast of the fight; and (3) was authorized by TWC, a cable operator,[2] to receive the broadcast of the fight. J&J, however, contends that the Defendants' conduct falls outside the safe harbor because, as the license holder for the closed-circuit broadcast of the fight, it did not authorize the Defendants' receipt of the broadcast. The district court appeared to accept J&J's contention, holding that J&J only had to prove "(1) that the Event was Shown in Greenville Avenue Pizza and (2) that J&J Sports did not authorize such exhibition of the Event."

We conclude that this ruling misconstrues § 553(a)(1). The text of the statute unambiguously states that liability extends only to the receipt of cable services *not authorized by a cable operator*. Therefore, in order for a cable customer to ensure that it is not criminally or civilly liable under § 553(a)(1), it need only receive authorization from a cable operator for the cable services it receives. J&J's argument, in essence, is that a cable customer who receives such authorization may still face liability under § 553 unless it takes the additional step of ensuring that the cable operator itself is licensed to distribute the various broadcasts that the customer views.[3] Interpreting the

---

[2] The parties do not dispute that TWC is a cable operator and that J&J is not. *See* 47 U.S.C. § 522(5) (2006) (defining cable operator).

[3] J&J frames the argument as follows: "Time Warner cannot give Appellants authority that Time Warner does not have." *See, e.g., J & J Sports Prods. v. Phelan*, No. 08-CV-00486-OWW-DLB, 2009 U.S. Dist. LEXIS 103626, at *24–25 (E.D. Cal. Nov. 5, 2009) (employing the same reasoning); *Nat'l Satellite Sports, Inc. v. Time Warner Entm't*, 217 F. Supp. 2d 466, 468 (S.D.N.Y. 2002) (same). While this concept has facial appeal, it is hard to imagine why a "safe harbor" would be needed in the situation J&J posits. Further, J&J is not left without a remedy as the unauthorized cable operator may itself be liable for its actions (as TWC

No. 13-10485

safe harbor in this highly restrictive manner finds no support in the text of the statute. The statute does not hinge liability on the cable customer taking additional steps or the cable operator being licensed to distribute a broadcast: The exclusion from liability simply applies to those who receive authorization from a cable operator. *See J&J Prods. v. Schmalz*, 745 F. Supp. 2d 844, 851 (S.D. Ohio 2010); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("Congress says in a statute what it means and means in a statute what it says there." (citation and internal quotation marks omitted)). Moreover, applying the safe-harbor provision in the manner J&J advocates would *expand liability* under the statute to ends not encompassed by the text, holding liable cable customers who unknowingly receive broadcasts that the cable company was not licensed to distribute, even though they were authorized by the cable operator to receive the broadcast.

We interpret the statute in accordance with its plain language: liability under § 553(a)(1) does not extend to those who are "specifically authorized . . . *by a cable operator*" to receive a broadcast. 47 U.S.C. § 553(a)(1) (emphasis added); s*ee Hartford Underwriters*, 530 U.S. at 6 ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (citation and internal quotation marks omitted)).[4]

---

acknowledged here by offering the $2,000 liquidated damages); the "safe harbor" protects only the innocent recipient, such as a small business like GAPC.

[4] Because the language of the statute is plain, it is not necessary to consider the legislative history. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989). However, we note that J&J's interpretation finds no support there either, as the legislative history suggests that Congress was concerned with the "theft of cable service," including "obtain[ing] cable service *without paying the installation and hook-up costs*" and "gaining access to premium movie and sports channels *without paying for the receipt of those services*." H.R. REP. NO. 98-934, at 83 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4720 (emphasis added). Here, the Defendants paid TWC for both the receipt of commercial cable service and the pay-per-view broadcast of the fight. There is no contention that the Defendants stole the

No. 13-10485

Even under this interpretation, J&J alternatively argues that TWC did not authorize the Defendants' receipt of the broadcast of the fight because it was distributed by HBO, and the "Business Class Service Agreement" ("Service Agreement") between GAPC and TWC included the following language:

> Customer understands and agrees that premium program services, such as HBO, Cinemax, Showtime, and The Movie Channel, may not be received or shown on any television receivers located in any public areas, such as lounges, dayrooms, visiting areas, or other common areas used by groups or the general public, nor shall Customer authorize or approve any copying, taping or duplicating thereof.[5]

However, this language does not unambiguously encompass this situation because the fight was not shown on a traditional HBO subscription channel, but was delivered via a pay-per-view broadcast that the Defendants requested and purchased separately from TWC.[6]  Additionally, other language in the

---

broadcast of the fight; instead, TWC admits that it mistakenly distributed the broadcast to the Defendants in return for a fee.  We find no indication in the legislative history that Congress sought to hold cable customers vicariously liable for the actions of cable operators as J&J would effectively have us do here. *Cf. id.* at 84 (in regards to the definition of "assist in intercepting or receiving" in § 553(a), the House Committee on Energy and Commerce expressed that it "d[id] not intend a person's clearly legal conduct to become illegal because of the actions of others about which such person had no knowledge").

[5] J&J also points to the following language in the Service Agreement: "As between the Parties, Customer is solely responsible for (a) all use (whether or not authorized) of the Service by Customer . . . ."  This language is unhelpful to J&J as it simply acknowledges that some uses of the cable service may be authorized while some uses may not be authorized.

[6] J&J cites to various district court cases that found lack of authorization based on a contract between a defendant and a different cable operator (primarily Comcast).  These cases are distinguishable because, among other reasons, the contracts in those cases differ from the contract here.  In particular, the Comcast contract specifically addressed pay-per-view broadcasts of sporting events in addition to the premium program services that are mentioned in the TWC agreement. *See, e.g., Joe Hand Promotions, Inc. v. Phoenix Promotions LLC*, No. 10-15102, 2012 U.S. Dist. LEXIS 102534, at *3 (E.D. Mich. July 24, 2012) (citing the language of the contract, which stated, "Comcast does not have the right to distribute pay-per-view video programming (including programming such as sporting events) and certain premium video services to commercial establishments.  Therefore, Customer agrees that it shall not exhibit or assist in the exhibition of any such programming unless

6

Service Agreement suggests that TWC obligated itself to ensure that the services it distributed to the Defendants were authorized and made pursuant to the proper license: "As between the Parties, TWC will obtain and maintain at its own expense all licenses, approvals and regulatory authority required by law with respect to TWC's operation and provision of the Services . . . ."

The Defendants submitted uncontroverted affidavits by representatives of the two parties to the Service Agreement (TWC and GAPC) stating that TWC authorized the receipt of the broadcast despite the language in the Service Agreement. The affidavits show that the Defendants did not steal, intercept, or obtain the broadcast under false pretenses. They further show that TWC: (1) was aware that GAPC was a commercial establishment holding a commercial cable account; (2) sold the broadcast of the fight to GAPC for $54.95; and (3) affirmatively delivered the broadcast of the fight to GAPC via pay-per-view broadcast.[7] Most significantly, a Vice President of TWC averred that "Greenville Avenue Pizza Company was authorized by Time Warner Cable to receive the broadcast on cable television of the [fight] on December 8, 2007."

In light of this evidence, there is at least a dispute of material fact as to whether the Defendants violated § 553. Accordingly, J&J failed to meet its summary judgment burden under § 553. *See* FED. R. CIV. P. 56(a).

---

explicitly authorized to do so, in advance and in writing, by Comcast and the applicable program or event distributor.").

[7] In this regard, the facts of this case are almost identical to those in *Schmalz*, where the court found that J&J could not maintain a § 553 claim against a TWC commercial customer who received a pay-per-view broadcast of a boxing match that TWC was not authorized to distribute to commercial customers. *See* 745 F. Supp. 2d at 851 ("Defendants were listed as a commercial customer, ordered the program as a commercial customer, were billed and paid for such service, as commercial customers. At no time did Defendants misrepresent their status as a commercial customer.").

No. 13-10485

*B. Whether § 605 Applies to the Defendants' Receipt of Cable Services*

J&J also sought summary judgment pursuant to § 605(a). The Defendants argued below, citing cases from our sister circuits, that § 605 was inapplicable because it prohibited only the unauthorized receipt of radio or satellite communications and the summary judgment evidence established that they received the fight via cable wire pursuant to TWC's cable service.[8] *See Charter Commc'ns Entm't I v. Burdulis*, 460 F.3d 168, 172–78 (1st Cir. 2006); *TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 199–207 (3d Cir. 2001); *United States v. Norris*, 88 F.3d 462, 464–69 (7th Cir. 1996). The district court implicitly found that the Defendants were liable under either §§ 553 or 605, maintaining that it was unnecessary to decide whether § 605 applied. In light of this ambiguity, J&J argues on appeal that the district court's grant of summary judgment may be upheld under § 605 because the broadcast of the fight originated via satellite transmission. *See Int'l Cablevision v. Sykes*, 75 F.3d 123, 129–33 (2d Cir. 1996).

Because of our ruling on § 553, we must determine whether the Defendants may be held liable under § 605, which does not contain the same safe harbor exception. This is an issue of first impression for our circuit, and our sister circuits are not uniform in their approach. *See Prostar v. Massachi*, 239 F.3d 669, 673 (5th Cir. 2001). We now join the majority of circuits in holding that § 605 does not encompass the conduct presented here: the receipt or interception of communications by wire from a cable system.[9] We conclude the plain language of the statute compels this interpretation. *See Hartford*

---

[8] It is undisputed that GAPC received the broadcast by wire from TWC's cable system.

[9] We specifically do not address how § 605 might apply to factual circumstances not present here, such as the receipt or interception of satellite or radio signals intended for receipt by a cable system.

*Underwriters*, 530 U.S. at 6 ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (citation and internal quotation marks omitted)).

The relevant portions of § 605(a) address only the unauthorized interception or receipt of *radio* communications:

> No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.[10]

47 U.S.C. § 605(a) (2006). Radio communications are defined as "the *transmission by radio* of [communications] of all kinds, including all instrumentalities, facilities, apparatus, and services . . . incidental to such transmission." 47 U.S.C. § 153(40) (emphasis added). Here, it is undisputed that the communications were not transferred to the Defendants by radio, but by cable, which makes them "communication[s] by wire" as that term was separately defined by Congress in the FCA. *See* § 153(59) ("'[C]ommunication by wire' means the transmission of [communications] of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and

---

[10] The first sentence of § 605 refers to the divulgence or publication of "communication by wire or radio." However, J&J does not argue that this sentence applies. This sentence is also not traditionally applied in the piracy context because it does not refer to the unauthorized interception or receipt of communications, and it is understood as "regulat[ing] the conduct of communications personnel." *Edwards v. State Farm Ins. Co.*, 833 F.2d 535, 540 (5th Cir. 1987); *see also TKR Cable Co.*, 267 F.3d at 201; *Norris*, 88 F.3d at 465; *Int'l Cablevision*, 75 F.3d at 131 n.4; S. REP. NO. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2197.

services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.").  Given that Congress clearly defined both radio and wire communications, it presumably would have included the word "wire" in the applicable sentences of § 605 if it intended for them to apply to the communications at issue here.  *See Charter Commc'ns*, 460 F.3d at 172–73 ("[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002))).[11]

J&J argues, however, that § 605(a) applies to the Defendants' receipt of wire communications because the definition for radio communications extends to "all instrumentalities, facilities, apparatus, and services (among other things, *the receipt, forwarding, and delivery of communications) incidental to [radio] transmission[s]*," and the broadcast of the fight originated as a radio communication prior to TWC retransmitting the broadcast by cable to GAPC. § 153(40) (emphasis added).  While this interpretation has been adopted by the Second Circuit, *see Int'l Cablevision*, 75 F.3d at 131, we agree with the Third and Seventh Circuits that it "'unacceptably blurs the line between radio and wire communications,'" which are separately defined terms that both refer to instrumentalities incidental to transmission of the communication. *TKR Cable*

---

[11] Moreover, the relevant sentences in § 605 previously referred to the receipt of "communication by wire or radio," Communications Act of 1934, Pub. L. No. 73-416, § 605, 48 Stat. 1064, 1103–04, but Congress later removed the references to wire communications. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 223.  When making this change, Congress explained that "regulation of the interception of wire or oral communications in the future is to be governed by proposed new chapter 119 of title 18, United States Code" (which is now codified at 18 U.S.C. §§ 2510 *et seq.* and is inapplicable here because it does not encompass television broadcasts).  1968 U.S.C.C.A.N. at 2196.  In other words, the legislative history suggests that Congress intentionally removed the word "wire" from § 605.

*Co.*, 267 F.3d at 202 (quoting *Norris*, 88 F.3d at 467); *see also* § 153(40), (59). Moreover, J&J's interpretation ignores the plain meaning of the terms by "demand[ing] undue contortion of the phrase 'instrumentalities [or] facilities . . . incidental to such transmission.'" *TKR Cable Co.*, 267 F.3d at 202 (quoting § 153(40)). As the Third Circuit has recognized, "the entire cable transmission infrastructure of a city or suburban area, a structure that provides a foundation for a significant business, . . . cannot be considered a mere instrumentality to transmission." *Id.*

The statutory framework of the FCA as a whole also confirms that § 605 does not apply to Defendants' receipt of cable communications. Section 553 covers the interception or receipt of cable communications without mentioning radio communications, just as § 605 covers the interception or receipt of radio communications without mentioning cable communications. A logical reading of the two provisions reveals a clear demarcation whereby "[§] 605 deals with communications traveling through the air (via radio), [and] § 553 covers communications traveling over cable wire." *Charter Commc'ns*, 460 F.3d at 173. Applying § 605 as J&J requests would remove this demarcation and require us to assume Congress's enactment of § 553 was largely superfluous— a course that we decline to take. *See id.* at 176; *TKR Cable Co.*, 267 F.3d at 204; *Norris*, 88 F.3d at 468; *see also United States v. Caldera-Herrera*, 930 F.2d 409, 411 (5th Cir. 1991) ("Where possible, statutes must be read in harmony with one another so as to give meaning to each provision.").

Accordingly, based on the plain meaning of § 605 and the statutory framework of the FCA, we hold that § 605 does not apply to the Defendants' receipt of communications by wire from TWC's cable system.[12] The district

[12] Although we need not examine the legislative history surrounding the FCA, we note that it simply confirms what is already evident from the text and statutory framework of the FCA. In particular, a prior version of § 605 referred to the receipt of wire communications,

No. 13-10485

court's grant of summary judgment, therefore, cannot be maintained under § 605 as J&J argues.

## IV.  Conclusion

Given our ruling, we need not reach the Defendants' additional arguments against summary judgment.[13]  The grant of summary judgment is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

---

but Congress removed the word "wire" when reenacting § 605 and enacted 18 U.S.C. §§ 2510 *et seq.* to regulate the interception of wire communications.  *See supra* note 11.  This left a regulatory gap because the definition of wire communications in the newly enacted provisions did not encompass cable television broadcasts.  *See* 18 U.S.C. § 2510(1); *Norris*, 88 F.3d at 465–66.  Section 553 was then passed to fill this void by prohibiting the unauthorized receipt or interception of cable services, which Congress observed was becoming a pervasive problem. *See generally Charter Commc'ns*, 460 F.3d at 176 ("Congress, in enacting § 553, was attempting to create a comprehensive regulatory regime covering the theft of all communications transmitted over a wire or cable—something that had largely been unregulated since the enactment of the Crime Control Act in 1968 and the removal of most references to 'communications by wire' from § 605."); *TKR Cable Co.*, 267 F.3d at 204 ("[T]he legislative history accompanying § 553 demonstrates that Congress drafted the provision to deter the newly emergent and previously unaddressed cable piracy . . . ."); *Norris*, 88 F.3d at 466.  In short, the legislative history suggests that § 553 was enacted specifically because § 605 was inapplicable to wire communications.

   [13]  Defendants' additional arguments are: (1) that J&J lacked statutory standing because its license to broadcast the fight extended only to broadcasts in a "place of public assembly" where "consideration is charged or received," and (2) that a two-year statute of limitations applies to J&J's claims.  Even were we to reach these arguments, the outcome of this appeal would be the same: the former argument, at most, highlights an additional dispute of material fact, and we are foreclosed from accepting the latter argument in light of *Prostar*, in which an earlier panel of this court held that a three-year statute of limitations applied to claims under §§ 553 & 605.  239 F.3d at 677–78; *see Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court.").