HON. LISA GODBEY WOOD, JUDGE
Plaintiff filed this action seeking damages pursuant to the Communications Act of 1934, as amended, and the Cable Communications Policy Act of 1984, as amended. Before the Court is Defendants' Motion for Summary Judgment. Dkt No. 33. After the parties submitted supplemental briefing on this complex case, this Motion has been fully briefed and is ripe for review. For the reasons stated below, Defendants' Motion is GRANTED in part and DENIED in part.
BACKGROUND
Hush a/k/a Peaches Sports Bar ("Peaches") is a business located in Waycross, Georgia. Dkt. No. 38-11 ¶ 1. Peaches is owned by Ohshy, Inc. Id. ¶ 3. Rupesh Patel is the president and general manager of Ohshy, Inc. Id. Ngwebifor Fobi worked at Peaches as a manager, employee, bartender, and marketing and promotions person. Id. ¶ 4. Fobi was not paid on a salary basis, but was paid by the tips she made, except that she sometimes received a bonus. Dkt. No. 38-6 at 4.
Plaintiff, J & J Sports Productions, Inc., is a distributor of sports and entertainment programming. Dkt. No. 38-1 ¶ 3. Plaintiff purchased and retained the exclusive commercial exhibition licensing rights to Miguel Cotto v. Sergio Martinez, SBC Middleweight Championship Fight Program (the "Program"), which was telecast nationwide on June 7, 2014. Id.; Id. at 10-16. The Program included the main event fight between Cotto and Martinez and many "undercard" fights. Id. ¶ 3. At no time did Plaintiff sublicense the right to display the Program to any of the Defendants. Id. ¶ 7.
On the night of the Program, Fobi was working at Peaches and used an internet search engine to find a website that was streaming the Program for free on the internet. Dkt. No. 38-11 ¶¶ 7, 8.[1] Fobi used *1371 her laptop computer to find and access the website. Id. Fobi's laptop was connected to television screens in the bar, and she showed the stream from the website on to the television screens in Peaches via this connection. Id. ¶ 6. The internet connection was provided by Great Lakes Data Vyve Broadband. Id. ¶ 12. Patel testified that Peaches did not have telephone lines, that Peaches had cable television, and that the internet connection was provided by the same cable company that provided Peaches with cable television. Dkt. No. 38-7 at 13, 21, 22.
Neither Fobi nor Patel paid a commercial licensing fee to show the Program at Peaches. Dkt. No. 38-8 at 4; Dkt. No. 38-7 at 6. Fobi testified that it was likely her idea to show the Program. Dkt. No. 38-6 at 5. Nevertheless, Fobi had authorization from Patel to show the Program without a commercial licensing fee, dkt. no. 38-8 at 4, and she would not have shown the Program without Patel's approval. Dkt. No. 38-6 at 7.[2] Prior to showing the Program, Fobi had talked with Patel about using a website to receive the Program. Id. at 3. Fobi advertised on Facebook and Twitter that Peaches would be showing the Program. Id.; Dkt. No. 38-6 at 6. Fobi tagged potential customers on the Facebook post advertising the Program. Dkt. No. 38-6 at 7. Fobi did not get explicit authorization to market Peaches' showing of the Program, but Patel knew that she generally posted to Facebook as part of her marketing duties without getting approval from him for the content of posts. Id. at 9.
Plaintiff hired a private investigator to go to Peaches on the night of the Program. Dkt. No. 33-6 at 20. The investigator saw the Program being broadcast on at least one television screen at Peaches. Id. Plaintiff avers that Defendants did not purchase from Plaintiff the right to display the Program commercially, and Plaintiff sued Defendants to recover damages under 47 U.S.C. § 553 and 47 U.S.C. § 605.
LEGAL STANDARD
Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).
The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case.
*1372 Id. at 325, 106 S.Ct. 2548. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257, 106 S.Ct. 2505.
The nonmovant may satisfy this burden in two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332, 106 S.Ct. 2548 (Brennan, J., dissenting) ). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e) ).
Discussion
It is alleged that the internet was used by Defendants to receive the Program. Both sides argued whether the internet might or might not fall within either 47 U.S.C. §§ 553 or 605. However, the United States Supreme Court has recognized that there are numerous ways to transmit data over the internet, such as by cable modem service using cable lines, digital subscriber lines using local telephone wires, terrestrial-based wireless networks, and satellite-based wireless networks. Nat'l Cable & Telecommuns. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 975, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).
Although the facts were submitted showing that the internet was used, the Court could not discern whether evidence in the record established the specific method of internet usage in this case and whether any evidence showed that Defendants utilized radio or a cable system by using the internet. As a result, the Court specifically invited each party to direct the undersigned to any evidence "that shows the means by which the data containing the Program was transmitted to Defendant Fobi's computer." Dkt. No. 45. Further, the parties were "invited to detail as specifically and technically as possible how that evidence" implicates either § 553 or § 605. Id."To be clear, the Court is searching the record for evidence (or the lack thereof) that the Program was received by Defendants over a cable system within the meaning of § 553, that the Program was a radio communication received by Defendants within the meaning of § 605, or that the Program was an intercepted radio communication within the meaning of § 605." Id.
In response, the parties reiterated their prior arguments. This Order does not hold that 47 U.S.C. § 605 can never be implicated through internet usage, nor that 47 U.S.C. § 553 is always implicated through internet usage. Rather, here the holding is limited to the conclusion that on this record sufficient evidence exists from which a reasonable jury could find that Defendants liable pursuant to 47 U.S.C. § 553.
I. The Statute of Limitations is Four Years
The Defendants argue that the action is time bared, so as an initial matter, the Court must determine the applicable statute of limitations. "Where a federal statute does not contain a limitations period *1373 courts should look to the most analogous state statute of limitations." Everett v. Cobb Cty. Sch. Dist., 138 F.3d 1407, 1409 (11th Cir. 1998) (citing Wilson v. Garcia , 471 U.S. 261, 266-67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) ).[3] Our sister court in the Northern District of Georgia has extensively explored this issue regarding 47 U.S.C. § 605. See DirecTV, Inc. v. Wright, 350 F.Supp.2d 1048 (N.D. Ga. 2004). The Wright court found that O.C.G.A. § 46-5-2, which provides for civil and criminal penalties for theft of telecommunication services,[4] is substantially similar in substance and form to § 605. 350 F.Supp.2d at 1054. The Court adopts this analysis.
Likewise, § 553 is substantially similar in substance and form to O.C.G.A. § 46-5-2. Like the Georgia statute, § 553 provides for injunctive relief, compensatory damages, costs, and attorneys' fees. Compare O.C.G.A. § 46-5-2(b)(4)with, 47 U.S.C. § 553(c). Both statutes provide for criminal penalties. Compare O.C.G.A. § 46-5-2(b)(1)-(3)with, 47 U.S.C. § 553(b)(1)-(3). In addition, both statutes provide for increased penalties for willful violations for purposes of commercial advantage or financial gain. Compare O.C.G.A. § 46-5-2(b)(5)(C)with, 47 U.S.C. § 553(c)(3)(B). Finally, the "cable system" protected by § 553"means a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service," 47 U.S.C. § 522, and the Georgia statute protects telecommunications services including "cable television service."
The Georgia statute is analogous to the federal statutes at issue. Because the statute of limitations for the Georgia code section is four years,[5] the Court adopts a four-year statute of limitations for Plaintiff's claims under both § 553 and § 605. This action was filed within the four year period and is not due to be dismissed as time-barred.
II. Defendant is Entitled to Summary Judgment on Plaintiff's 47 U.S.C. § 605 Claim
Plaintiff's first claim is under 47 U.S.C. § 605 of the Communications Act. Under this section, the following practices are prohibited:
[1] Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney ...
[2] No person not being authorized by the sender shall intercept any radio communication and divulge or publish *1374 the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.
[3] No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.
[4] No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.
47 U.S.C. § 605(a).
The first sentence of § 605(a) does not apply to Defendants' conduct. As far back as 1938, four years after the initial passage of the Communications Act, the first sentence of § 605(a) has been understood to apply only to communications personnel. See Sabloswky v. United States, 101 F.2d 183, 186 (3d Cir. 1938) ("Turning now to an examination of Section 605 we find that its first clause ... prohibits employees of communication agencies from divulging any interstate or foreign communication except upon lawful authority."). Even after the 1968 Omnibus Crime Control Act that amended § 605 and added a narrow exception to the first sentence that does not apply here, courts have continued to interpret the first sentence to apply only to communications personnel or authorized intermediaries (such as a cable company). See, e.g., TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 201 (3d Cir. 2001) ("To ensure autonomy and coherence in the novel framework of the 1968 Act, Congress amended § 605 from the Communications Act to remove references to wire communications from all but the first clause of § 605(a), which banned the divulgence of wire and radio transmissions by communications personnel."); National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 916 (6th Cir. 2001) ("An authorized intermediary of a communication (such as Time Warner) violates the first sentence of § 605(a) when it divulges that communication through an electronic channel to one 'other than the addressee' intended by the sender."); Int'l Cablevision, Inc. v. Sykes, 75 F.3d 123, 131 n.4 (2d Cir. 1996) ("The first sentence of § 605(a) is probably directed at communications personnel."); United States v. Norris, 88 F.3d 462, 465 (7th Cir. 1996) ("The 1968 Omnibus Crime Control Act amended what is now § 605(a) to remove reference to wire communications from all but the first clause, which prohibits the divulging of wire or radio transmissions by communications personnel."); Edwards v. State Farm Ins. Co., 833 F.2d 535, 540 (5th Cir. 1987) (recognizing that "the first sentence of section 605... regulates the conduct of communications personnel"). Furthermore, the legislative history of the 1968 Act reveals that the first sentence of § 605(a)"is designed to regulate the conduct of communications personnel." S. Rep. No. 90-197, at 78 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2197. Because Plaintiff has not shown that any of the Defendants were acting as communications personnel or authorized intermediaries when they received the Program, Plaintiff cannot recover under the first sentence.
Plaintiff cannot recover under the second or fourth sentences either, because both sentences require an interception of a radio communication. The second sentence states in relevant part: "No person *1375 not being authorized by the sender shall intercept any radio communication ..." 47 U.S.C. § 605(a) (emphasis added). The fourth sentence states in relevant part: "No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted , shall ..." Id. (emphases added). In its Brief in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, dkt. no. 38, Plaintiff relies on its allegation in its amended complaint, dkt. no. 20, to show that an interception occurred, but Plaintiff has provided no evidence showing that Defendants intercepted a radio communication or that Defendants knowingly received a radio communication intercepted by someone else. With no evidence showing an intercepted radio communication, Plaintiff cannot recover under the second or fourth sentences, leaving only the third sentence as a possible avenue of recovery.
The third sentence states: "No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a). Courts are split in interpreting this sentence. Some courts hold that one must receive an unauthorized communication directly by radio (such as by a satellite dish) to be liable. Other courts hold that one can be liable for receiving by wire an unauthorized communication that had previously been transmitted by radio. Compare TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 207 (3d Cir. 2001) ("Once a satellite transmission reaches a cable system's wire distribution phase, it is subject to § 553 and is no longer within the purview of § 605.") with, International Cablevision, Inc. v. Sykes, 75 F.3d 123, 131 n.5 (2d Cir. 1996) (finding that the third sentence of § 605(a) applies to "programming distributed from the headend of a cable television system" as long as it "originate[d] as a radio communication"). Because the former reading, i.e., an alleged unauthorized communication must be received directly by radio, comports more with the plain language and the legislative history of the statute, the Court adopts that interpretation.
Consistent with this Court's analysis, the Third Circuit in TKR thoroughly analyzed this issue and rejected the Sykes court's analysis. See TKR, 267 F.3d at 199-208. Regarding the legislative history, the TKR court found that "Congress removed coverage of wire communications from § 605"; thus, Congress excluded from the purview of § 605 wired communications like those occurring over the internet or cable services. Id. at 202. TKR recognized that the House committee report for the Act that created § 553 backed this interpretation:
The Committee intends the phrase "service offered over a cable system" to limit the applicability of [ § 553 ] to theft of a service from the point at which it is actually being distributed over a cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.
Id. at 206 (alteration in original) (quoting H.R. Rep. No. 934, at 83-84, as reprinted in 1984 U.S.C.C.A.N. 4720, 4720-21). Other courts have relied on this legislative history to reach the same conclusion as the TKR court. See, *1376 Charter Commc'ns Entm't I, DST v. Burdulis, 460 F.3d 168, 173 (1st Cir. 2006) ; U.S. v. Norris, 88 F.3d 462, 465 (7th Cir. 1996) ; TCI Cablevision of New England v. Pier House Inn, Inc., 930 F.Supp. 727, 735 (D.R.I. 1996) ; Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc., No. CIV.A. 93-CV-3854, 1996 WL 402511, at *6 (E.D. Pa. Apr. 12, 1996).
Regarding the plain language of the statute, because internet transmissions "are not 'incidental' to the transmission of radio communications, the § 153(33) [now § 153(40) ] definition of radio communications that accompanies § 605 does not apply here." TKR, 267 F.3d at 202. The definition of "communication by radio" as used in the third sentence of § 605"means the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C. § 153(40) (emphasis added). Because internet data transmitted by cable companies over cable wires is not a service "incidental" to satellite communications, communications by satellite that are received and then retransmitted over the internet are not covered by § 605. To hold otherwise would grossly mischaracterize the massive scale and wired infrastructure of the internet. See TKR, 267 F.3d at 202 ("Suggesting that an entire cable infrastructure constitutes a mere instrumentality incidental to the transmission of a satellite broadcast ignores the scale of effort entailed in delivering this transmission to a given residence.").
Because Plaintiff has not shown any evidence that Defendants received the Program by radio within the meaning of § 605(a), Plaintiff cannot recover under the third sentence. See, e.g., Charter Commc'ns Entm't I, DST v. Burdulis, 460 F.3d 168, 173 (1st Cir. 2006) ("[T]he fact that the transmissions were intercepted as they were transmitted via cable, not radio, is dispositive."); U.S. v. Norris, 88 F.3d 462 (7th Cir. 1996) (holding that § 605 does not apply to transmissions over a cable system even if those transmissions were previously transmitted by radio); Scientific-Atlanta, Inc. v. Fenley, No. 1:95cv1584, 1997 WL 33543688 (N.D. Ga. Jan. 14, 1997) (same).
Plaintiff, nonetheless, argues that persuasive authority shows that § 605(a) covers internet transmissions. First, Plaintiff looks to J & J Sports Productions, Inc. v. Vega, where that court denied a motion to plead an affirmative defense that § 605 does not apply to internet signals. No. 5:15cv5199, 2016 WL 4132290 (W.D. Ark. Aug. 2, 2016). There the court noted that a "straightforward reading of the [ § 605's] pertinent text" shows it is "explicitly concerned with whether unauthorized communications were sent or received 'by wire or radio.' " Id. at *4 (quoting sentence one of 47 U.S.C. § 605(a) ). But Vega found liability possible under the first sentence of § 605(a), which does not apply to the facts here. Notably, Vega never addressed the long-standing and well-established interpretation that the first sentence only applies to communications personnel or authorized intermediaries. Second, Plaintiff looks to J & J Sports Productions, Inc. v. Jaschkowitz, No. 5:14cv440, 2016 WL 2727015 (E.D. Ky. May 6, 2016). The Jaschkowitz court came to the same conclusion as the Vega court, finding the defendant liable under the first sentence of § 605(a) when a patron of a bar connected his smart phone that was streaming a fight via an internet connection to a projector television in the bar. Id. at *4. Jaschkowitz, like Vega, never addressed the communications personnel issue.[6]
Third, Plaintiff discusses a case denying a motion to dismiss where the plaintiff *1377 alleged that the defendants intercepted an original signal via an internet stream. Joe Hand Promotions, Inc. v. Maupin, No. 15-cv-6355, 2016 WL 6459631 (E.D.N.Y. Oct. 31, 2016). But here, Defendants are not alleged to have intercepted the Program, unlike the defendants in Maupin. Id. at *6 ("This is not an instance where the Defendants copied a broadcast; they intercepted the original signal from the Plaintiff UFC's website using cable internet."). Furthermore, Maupin was decided by a court in the Second Circuit, which is bound to follow Sykes. Finally, Plaintiff points to Intercom Ventures, LLC v. City Media Plus Ex-Yu Streaming, where the court denied a motion to dismiss. No. 12C10275, 2013 WL 4011052 (N.D. Ill. Aug. 6, 2013). But the facts there are, again, materially different in that the defendants were alleged to have "pirated the European radio signals." Id. at *7 (emphasis added). Here, Plaintiff has provided no evidence that any radio signal was intercepted or received by Defendants or that a radio signal was intercepted by someone else.
Defendants have shown, and Plaintiff has not disputed, that the Program was received by Defendants over an internet connection, not a radio or satellite connection. Plaintiff must provide some evidence that could allow a reasonable factfinder to conclude that § 605 was violated. Plaintiff has merely attempted to rebut Defendant's many arguments but has not provided any evidence. Because Plaintiff cannot recover under § 605(a) based on this record, Defendants' Motion for Summary Judgment on this claim is due to be GRANTED.
III. Defendant is not Entitled to Summary Judgment on Plaintiff's 47 U.S.C. § 553 Claim
47 U.S.C. § 553(a) provides that:
(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.
For Plaintiff to succeed, when the Program was received by Fobi's computer it must have been (1) a "communications service offered over a cable system" (2) not "specifically authorized ... by a cable operator" and (3) not "specifically authorized by law." Id. Because there is sufficient evidence from which a reasonable jury could find that the internet connection utilized to receive the Program was a "cable system" within the meaning of § 553 and that the Program's reception by Defendants was not specifically authorized by either a cable operator or by law, Defendants are not entitled to summary judgment on this claim.
A. A Reasonable Jury Could Find that the Program was Received over a Cable System
The United States Supreme Court has recognized that "[t]here are two principal kinds of broadband Internet service: cable modem service and Digital Subscriber Line (DSL) service." Nat'l Cable & Telecomms. Ass'n, 545 U.S. at 975, 125 S.Ct. 2688. "Cable modem service transmits data between the Internet and users' computers via the network of television cable lines owned by cable companies "; DSL service uses telephone wires. Id. (emphasis added). The owners of the cable and telephone lines either act as internet service providers (ISPs) themselves, or they lease their infrastructure to independent ISPs that then use the cable or telephone lines to provide internet to their customers. Id.
Here, sufficient evidence was presented from which a jury could find that the Defendants' internet connection was by cable modem service, which uses "the network of television cable lines owned by cable companies." Id. First, Defendant Patel testified that Peaches had cable television.
*1378 Second, Patel testified that Peaches did not have telephone lines. Finally, Patel testified that the internet connection was provided by the same cable company that provided Peaches with cable television. Thus, a reasonable jury could find that the internet connection at Peaches was cable modem service and thus received by means of "the network of television cable lines owned by" the cable company that provided Peaches cable television. Id.
Because the Program was transmitted over the cable lines that also transmit cable television, a reasonable jury could find that the Program was received "over a cable system" within the meaning of § 553. "Cable system" in § 553 is defined in relevant part as a "a facility ... designed to provide cable service." 47 U.S.C. § 522(7). "Cable service" is defined as "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. § 522(6). The issue, then, is whether a reasonable jury could find, based on this record, that the Program was sent over a "facility ... designed to provide cable service," 47 U.S.C. § 522(7), which means in relevant part "the one-way transmission to subscribers of video programming," 47 U.S.C. § 522(6). Based on this record, a reasonable jury can because it is reasonable to infer that Defendants received the Program by means of cables that are also used to transmit cable television. Notably, to violate § 553, the unauthorized communications do not need to be part of a cable service, rather what matters is whether the unauthorized communications were sent over a "facility ... designed to provide cable service." 47 U.S.C. § 522(7) (emphasis added). In other words, under the statute it is the infrastructure utilized to transmit the communication, not the type of communication (e.g., cable programming or internet data), that is relevant to the "offered over a cable system" requirement of § 553.
B. A Reasonable Jury Could Find that Defendants were not Specifically Authorized to Receive the Program
Because Defendants have moved for summary judgment, they must show that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, Defendants have not argued or provided evidence that they were "specifically authorized by law" to receive the Program. 47 U.S.C. § 553(a)(1). Second, Defendants have not shown as a matter of law that they were "specifically authorized" to receive the Program by "a cable operator." 47 U.S.C. § 553(a)(1).
Defendants have provided no evidence that they were specifically authorized by a cable operator to receive the Program other than the fact that Defendants received the Program from a website via internet provided by their ISP. This fact, Defendants argue, shows that they were "authorized by the internet provider and website to receive the signal for the subject TV program." Dkt. No. 33 at 8. First, under § 553 Defendants must have been specifically authorized by a cable operator, not an internet provider or a website. No party is entitled to judgment as a matter of law on this issue at this point in the case.
Second, even if Defendants argued that they were authorized by a cable operator that was acting as their ISP, Defendants have not shown as a matter of law that the simple act of accessing a website means that the cable operator that was acting as their ISP specifically authorized those communications. Defendants set forth two cases in support of the proposition that they were specifically authorized by their ISP, but these cases are materially distinguishable *1379 because they all dealt with defendants that purchased television programming from a cable operator. See J & J Sports Prods., Inc. v. Schmalz, 745 F.Supp.2d 844, 850-51 (S.D. Ohio Sept. 17, 2010) (finding that the defendant was specifically authorized by its cable company to receive a cable program when it purchased the program from the cable company, even though the cable company did not have the rights to sell the program to the defendant); J & J Sports Prods., Inc. v. Mandell Family Ventures, L.L.C., 751 F.3d 346, 348-50 (5th Cir. 2014) (denying summary judgment for the plaintiff under the same circumstances as in Schmalz ).[7] Thus, in both of the relevant cases set forth by Defendants, the defendant purchased the programming at issue from the cable operator.
Here, Defendants accessed a website on the internet and did not purchase anything from anyone. This distinction is important because under § 553 the communications must be specifically authorized; a purchase of a communication from the entity that then sends the communication directly to the purchaser shows that the entity sending the communication specifically authorized the purchaser's reception of the communication. Here, the ISP merely provided access to the internet. The ISP did not undertake any conscious actions to send the Program to Defendants, unlike the cable operators in Schmalz and Mandell, which made the conscious effort to send the communications directly to the purchasers.
In stark contrast to Defendants, Plaintiff has shown evidence in the record showing that Defendants were not authorized by their cable operator to receive the Program. The Acceptable Use policy of Defendants' internet provider states that "Customer will not use, nor allow others to use, the Service to send or receive any information which infringes the ... proprietary rights of any other person, entity or business organization." Dkt. No. 38-10 at 3. Plaintiff has provided the licensing agreement giving it the exclusive license to exhibit the Program at commercial establishments such as Peaches. And Defendants have admitted that they did not purchase from Plaintiff a sublicense to exhibit the Program in Peaches. Thus, a reasonable jury could find that Plaintiff had a proprietary right in the exhibition of the Program in commercial establishments that included Peaches, that Defendants infringed on this right when it showed the Program in Peaches without a sublicense from Plaintiff, that Defendants violated the Acceptable Use policy of its internet provider, and, finally, that Defendants were not specifically authorized by a cable operator to show the Program in Peaches.
For these reasons, a reasonable jury could find that Defendants received the Program over a cable system without specific authorization from a cable operator or by law. Accordingly, Defendants Motion for Summary Judgment on this claim is due to be DENIED.
IV. The Individual Defendants, Rupesh Patel and Ngwebifor Fobi, are not Entitled to Summary Judgment
Defendants have argued that Fobi and Patel should be analyzed the same, but courts in this circuit and this district have consistently analyzed the liability of individual defendants and corporate owners under § 553 differently. An individual defendant can be liable as the one who violated *1380 the statute, while a corporate owner can be liable under a theory of vicarious liability. See, e.g., J & J Sports Prods., Inc. v. Flame Bar & Grill, LLC, No. CV 118-061, 2018 WL 5283447, at *2 (S.D. Ga. Oct. 24, 2018) (distinguishing the standards of liability for an individual defendant and corporate owner); Joe Hand Promotions, Inc. v. Caddyshanks, LLC, No. 8:12cv2675, 2013 WL 869527, at *4 (M.D. Fla. Mar. 7, 2013) (determining whether a corporate owner was vicariously liable); Joe Hand Promotions, Inc. v. Blanchard, No. 4:09cv100, 2010 WL 1838067, at *3 (S.D. Ga. May 3, 2010) (same).
To find an individual liable under 47 U.S.C. § 553(a), a plaintiff must show that the defendant: (1) intercepted, received, or assisted in intercepting or receiving (2) a communications service offered over a cable system (3) without specific authorization by a cable operator or by law. Here, Fobi received the Program when she accessed the website showing the Program from her computer. A reasonable jury could find that the Program was a communications service, which is undefined in the statute, offered over a cable system. Finally, a reasonable jury could find that Fobi did not have specific authorization from a cable operator or by law. Thus, a reasonable jury could find Fobi liable for violating § 553.
Patel's liability, however, can only be established under a vicarious liability theory because Patel was not present at Peaches on the night the Program was shown, so he could not have received the Program directly (unlike Fobi). Nevertheless, courts in this circuit and this district have consistently found that an individual officer of a corporation can be found guilty for violating § 553 under a vicarious liability theory. These courts have routinely found that a plaintiff must show that the individual had a "right and ability to supervise the violations, and that he had a strong financial interest in such activities." Flame Bar & Grill, 2018 WL 5283447, at *2 (quoting Blanchard, 2010 WL 1838067, at *3 ); accord Caddyshanks, LLC, 2013 WL 869527, at *4 ; Joe Hand Promotions, Inc. v. Sorota, No. 11-80985, 2012 WL 2414035, at *2 (S.D. Fla. June 26, 2012).
A reasonable jury could find both that Patel had a right and ability to supervise the violations and that he had a strong financial interest in such activities. Regarding the first requirement, Fobi testified that Patel authorized the showing of the Program at Peaches, that Fobi would not have shown the Program without Patel's authorization, and that Fobi talked with Patel about using a website to receive and show the Program. A reasonable jury could find that Patel had a right and ability to supervise the violation, i.e., the showing of the Program at Peaches, based on these facts. Turning to the second requirement, a reasonable jury could find that Patel had a strong financial interest in the showing of the Program at Peaches. Patel was and still is the president and general manager of the entity that owned Peaches. Thus, he had a strong financial incentive to increase the sales numbers on the night the Program was shown and to increase the customer base by showing and advertising the Program.
For these reasons, Defendants Motion for Summary Judgment with respect to Defendant Fobi and Patel is due to be DENIED.
V. Defendants may be Liable for Enhanced Statutory Damages[8]
Under 47 U.S.C. § 553(c)(3)(B), if a court "finds that the violation was committed willfully and for purposes of commercial *1381 advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $50,000." Here, Defendant fails to show as a matter of law that the violation was not committed willfully and not for the purpose of commercial advantage or private gain. Here, Fobi consciously chose to use the internet to access a free website to show the Program at a commercial establishment. Patel, under this record, also expressly authorized the showing of the Program, and implicitly authorized the advertisement of the Program. Further, Fobi's compensation for working at Peaches was tip money, so she had an incentive to maximize the number of customers at Peaches. By advertising that Peaches would be showing the Program, Fobi could be shown to have attempted to increase foot traffic at Peaches and thus increase her tip money. Finally, Patel, as the president and general manager of the entity that owned Peaches, could be shown to have sought commercial advantage and private gain when he authorized the Program to be shown at Peaches without a license from Plaintiff. On this record, Defendant has not satisfied its burden as the movant on this issue. Accordingly, Defendants' Motion for Summary Judgment on this issue is due to be DENIED.
CONCLUSION
For these reasons, Defendant's Motion for Summary Judgment is GRANTED as in part and DENIED in part.
SO ORDERED, this 8th day of November, 2018.

Plaintiff objected to these facts as "immaterial." Dkt. No. 38-11 ¶¶ 7, 8. Under Local Rule 56.1, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party." The facts that the Court sets forth from Defendants' Statement of Material Facts pursuant to Local Rule 56.1 have not been controverted by Plaintiff and are thus deemed admitted.

Patel declared that he did not authorize Fobi to show the Program and that he did not know it was going to be shown. Dkt. No. 33-2 ¶ 3. At this stage of the proceeding, however, the Court must take all facts in the light most favorable to the non-moving party, i.e., Plaintiff; thus, Fobi's testimony on this issue is adopted for purposes of this Order.

An exception to this rule exists. Federal courts will bypass a state law analogy and instead look to a federal law analogy when "the importation of state law will [ ] frustrate or interfere with the implementation of national policies." Occidental Life Ins. Co. v. E.E.O.C., 432 U.S. 355, 367, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). This exception does not apply here.

Defined as "any service provided for a charge or compensation to facilitate the origination, transmission, emission, or reception of signs, signals, data, writings, images, sounds, or intelligence of any nature by telephone or telephone service, including public pay telephones, or cable television service (CATV), including cellular or other wireless telephones, wire, radio, electromagnetic, photoelectronic, or photo-optical system." O.C.G.A. § 46-5-3(a)(1).

See O.C.G.A. § 9-3-31 and O.C.G.A. § 9-3-32. See also Wright, 350 F.Supp.2d at 1054 n.4.

Plaintiff again relies on Jaschkowitz in its Supplemental Brief. Dkt. No. 46 at 2.

Defendants also point to J & J Sports Productions, Inc. v. Port Richmond Emporium Corp., No. 12CV4926, 2014 WL 692189 (E.D.N.Y. Feb. 21, 2014), for support. But the defendant in Port Richmond purchased programming from a satellite television operator, not a cable operator. Thus, that case is not dispositive.

Defendants also moved for partial summary judgment on the issue of punitive damages, but Plaintiff does not seek punitive damages. See generally Dkt. No. 20.